[Cite as *Orick v. Dayton*, 2011-Ohio-4193.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| GREGORY ORICK | : | |
| | : | Appellate Case No. 24259 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 09-CV-762 |
| v. | : | |
| | : | (Civil Appeal from |
| CITY OF DAYTON, et al. | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 19th day of August, 2011.

. . . . . . . . . . .

ROBERT L. CASPAR, JR., Atty. Reg. #0039625, 7460 Brandt Pike, Dayton, Ohio 45424
        Attorney for Plaintiff-Appellee

JOHN J. DANISH, Atty. Reg. #0046639, by NORMA M. DICKENS, Atty. Reg. #0062337,
City Attorney's Office, 101 West Third Street, Post Office Box 22, Dayton, Ohio 45401
        Attorneys for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1}   Defendant-appellant the City of Dayton ("City") appeals from a judgment of

the Montgomery County Common Pleas Court modifying a decision of the City of Dayton

Civil Service Board ("DCSB") to suspend plaintiff-appellee Gregory Orick from his

employment with the City for a period of eight hours.  The trial court concluded that the

DCSB's decision was not supported by a preponderance of substantial, reliable, and probative evidence, and disaffirmed the suspension.

{¶ 2} The City contends that the trial court erred when it found that the decision of the DCSB was not supported by a preponderance of substantial, reliable, and probative evidence. We conclude that the trial court did not abuse its discretion, nor did the trial court improperly credit the testimony of one set of witnesses over another. Accordingly, the judgment of the trial court is Affirmed.

I

{¶ 3} This case arises from an encounter between police officers and Arthur Martin. In February 2008, Dayton Police Officer Gary Lowe made a routine traffic stop of an automobile that had turned left without signaling. It was about 4:00 a.m. The stop occurred in the City of Dayton, on Grand Avenue. Lowe discovered that the driver did not have a driver's license, and asked him to step out of the vehicle. As Lowe was placing the driver in his cruiser, Officer Gregory Orick arrived.

{¶ 4} Martin was a passenger in the car. Lowe discovered that the driver had a few warrants, but Martin did not. Orick walked up to the passenger side of the car and told Martin that he was free to go. Martin was 5'10" tall, weighed around 290 pounds, and was significantly larger than Orick.

{¶ 5} Orick told Martin that he needed to step away from the car and needed to leave. The officers were going to tow the car due to the driver's arrest, and needed to inventory the vehicle. For purposes of officer safety, Martin needed to move on down the street.

{¶ 6} Martin refused to move, stating that it was a public sidewalk and he did not

have to go anywhere. Orick asked Martin more than fourteen times to go. His warnings included statements to Martin that he needed to leave the area, that Martin would be under arrest if he failed to leave, and finally, that Martin would be tasered if he failed to leave. Orick also warned Martin that if he did not leave the area, he would be arrested for disorderly conduct and obstructing official business. After being warned again to leave, Martin took one exaggerated step to the left and said, "How's this?"

{¶ 7} Orick withdrew his Taser and told Martin that he would be tasered if he did not leave the area. Martin crossed his arms, puffed himself up, and said, "It's up to you, dog." Orick used his Taser on Martin once, at which point, Martin dropped to the ground, immobilized. Orick then said, "You are not so tough now, are you?"

{¶ 8} After tasering Martin, Orick called his supervisor, Sergeant Phillip Hubbard, who responded to the scene to investigate. Under departmental policy, an investigation is conducted whenever force is used to arrest a subject. Hubbard discovered that a video of the incident existed, reviewed the video, and copied it. Hubbard also talked to both officers and to Martin about the events. Hubbard concluded that Orick had violated the use of force policy by failing to tell Martin that he was under arrest and to put his hands behind his back. Hubbard also concluded from reviewing the video that Orick would not have been placed in harm's way by including this step. Although Hubbard initially recommended that a reprimand be issued, Hubbard was not the hearing officer in the department for possible penalty violations. Once Hubbard decided a possible violation had occurred, he took the video down to the departmental advocate.

{¶ 9} In May 2008, Orick was notified that he was charged with having violated Rule

13, Section 2(B)(conduct unbecoming an employee in the public service), and/or Section 2(D) (incompetency, inefficiency, or neglect of duty), and/or Section 2(I) (violation of any enacted or promulgated statute, ordinance, rule, policy, regulation, or other law) of the Civil Service Rules and Regulations of the City of Dayton, Ohio. The specification to the charges stated that:

{¶ 10} "On or about February 5, 2008, you engaged in conduct of an inappropriate and/or unprofessional nature in tasing a subject. Such conduct is in violation of the Rules of Conduct for Sworn Personnel the pertinent provision of which states: 6.8 No officer will use unnecessary force against any citizen."

{¶ 11} At the time of the incident, the use of force was governed by Dayton Police Department General Order 3.03-2 Use of Force. Order 3.03-2 provides, in pertinent part, as follows:

{¶ 12} "Police officers are authorized to use force when necessary to protect life, property and to maintain order. The responsible exercise of this authority is among the most critical aspects of law enforcement. The use of excessive or unjustified force undermines community confidence in the department and its officers and will not be tolerated. Ultimately, it may subject the officer, the department and the city to criminal and/or civil liability.

{¶ 13} "Police officers will encounter circumstances, which require that force be used in the enforcement process. It is the policy of this department that force will only be used to overcome resistance or stop aggression, and then only that amount of force which is necessary to overcome that resistance. Officers will respond to resistance or aggression in accordance

with the objective reasonableness standard outlined in the Supreme Court case of Graham v. Conner, 490 U.S. 386, 109 S. Ct. 1865.

{¶ 14} " * * * *

{¶ 15} "It is recognized that in exceptional circumstances, violations of this policy may be justified by necessity. Every use of force will be reviewed on a case-by-case basis to determine the reasonableness of the officer's actions." Joint Exhibit III, p. 1.

{¶ 16} Section I of the policy defines use of force, and in Section (I)(B), states that use of force occurs "[a]nytime an on-duty officer knowingly strikes, injures or uses Oleoresin Capsicum (OC Spray) or the Taser-X-26 on another person." Joint Exhibit III, p. 2. Subsection (I)(B)(3) further states that:

{¶ 17} "3. TASER X-26

{¶ 18} "Dayton police officers that have been trained, certified and pass the yearly recertification by the Dayton Police Academy are authorized to carry and use the TASER X-26.

{¶ 19} "a. The following is a non-exclusive list of when the use of the TASER X-26 is appropriate:

{¶ 20} "(1) To subdue actively hostile individuals who have resisted verbal commands.

{¶ 21} "(2) When physical control techniques are warranted (physical resistance).

{¶ 22} "(3) When officer injury is possible and/or anticipated.

{¶ 23} "(4) Persons who have expressed the intent and have the means to commit suicide." Id at p. 3.

**{¶ 24}** At the time of the incident, Lieutenant Michael Martin was assigned as acting superintendent of the patrol operations division, and was the departmental hearing officer for Orick's case. Lieutenant Martin reviewed the video and also heard Orick testify. Lieutenant Martin found Orick guilty of using unnecessary force and recommended a three-day (24 hour) suspension. Lieutenant Martin concluded that Orick had never given Arthur Martin a chance to be arrested, and to comply and put his hands behind his back. In testimony at the subsequent civil service hearing, Lieutenant Martin stated as follows:

**{¶ 25}** "You know, this gentleman [Arthur Martin] was just noncompliant. He was noncompliant by his actions of just taking a stance and I am on a public sidewalk, I am not going anywhere. And that was, that was his issue. However, at the point you decide after warning him several times to leave that you are going to arrest him, you have to give him a chance to be arrested. Do you have to say even that you are under arrest? It makes sense, you know. He could have told him put your hands behind your back, you are going to jail. I guess you don't have to use the arrest word if you don't want to. But you have to give the guy a chance to comply with your commands.

**{¶ 26}** "At the point he is not going to comply, you decide to arrest him for obstructing official business, whatever, you need to give him a chance. We don't know that the force was necessary because he didn't give him a chance, is the simple facts of the case." November 18, 2008 DCSB Hearing Transcript, p. 82.

**{¶ 27}** Lieutenant Martin's recommendation was reviewed by Dayton Police Chief Richard Biehl. Biehl reviewed the video and concluded that Orick had violated the use of force rule. Biehl therefore approved the three-day suspension. At the DCSB hearing before

the Civil Service Board, Biehl testified that Martin needed to be clear that he was not free to leave and was under arrest, and needed to be given an opportunity to comply. If Martin failed to comply at that point, force would be reasonable. In this regard, the following exchange occurred:

{¶ 28} "Q. There was testimony, questions earlier that at the point that he's Tasered, isn't that in effect the arrest, isn't that the arrest, and why is that not sufficient given that he had been warned several times prior to then?"

{¶ 29} "A. I think clearly at that point, he's been seized. But the issue is the appropriateness of force as it relates to a resistance or a violent or hostile behavior. He has not resisted at that point. He has not complied with an officer's order, which can constitute an offense for which he can be arrested. He needs to be informed that he is under arrest. Should he not comply at that point, then the use of force of some type, which is reasonable, would be appropriate.

{¶ 30} "Q. So being warned that he is going to be arrested is not the same as being told that he is under arrest.

{¶ 31} "A. No. I think it needs to be clear that he is not free to leave. And I don't think any of his conduct indicated that he wasn't free to leave. That needs to be communicated. It needs not to be just warned. I have warned many, many a person multiple times of the possibility of arrest and never affected an arrest. A warning is an effort to get them to move into compliance. At some point that isn't accomplished, they need to be told you are now under arrest. Should they now resist arrest, then reasonable force would be appropriate." Id. at 126-27.

**{¶ 32}** Biehl discussed the first listed use of force, which allows officers to subdue actively hostile individuals who have resisted verbal commands. Biehl indicated that Martin's refusal was the refusal of a verbal command, but Martin was not actively hostile at that point. Martin was just being noncompliant. Biehl concluded that Section I(B)(3)(e) was more pertinent. This section of the use of force policy states that:

**{¶ 33}** "TASER use is appropriate only to the extent needed to bring an individual under control/arrest." Joint Exhibit III, p. 3.

**{¶ 34}** In this regard, Biehl stressed that:

**{¶ 35}** "A. * * * [Subsection (e)] says that the Taser use is appropriate only to the extent needed to bring an individual under control or arrest. I think that's the key here. He is not – he's merely being noncompliant. He needs to be taken into custody. There is no indication that force is necessary at that specific time. Now it may have been subsequent to that but not at that time.

**{¶ 36}** "And I go back and repeat, this is not an act of malice here, this is not someone who is maliciously using force, this is an error in judgment, but there is an important step that was missed in this process that is yet an important step." November 18, 2008 DCSB Hearing Transcript, pp. 129-30.

**{¶ 37}** Biehl acknowledged that Martin's last action of standing with his arms crossed, legs spread and digging in, may have given Orick reason to believe that Martin may pose a threat. Biehl stated, however, that "[s]o at that particular time, he's just failing to comply with moving on down the sidewalk. There is no evidence that at that point, given his conduct as viewed in the video, that he was intending to assault Officer Orick." Id. at p. 145.

{¶ 38} As noted, Biehl agreed with the departmental hearing officer, and approved a three-day suspension. Orick then appealed to the DCSB, and a hearing was conducted by Board member W. James Owens. Officers Hubbard, Martin, and Biehl testified as recounted above. Orick also presented testimony from Lieutenant Patrick Welsh, Officer Lowe, and Officer Michael Fuller. Orick also testified.

{¶ 39} Welsh was an officer, instructor at the police academy, and elected bargaining unit representative of the supervisor's bargaining unit. In addition, Welsh stated that he was qualified as an expert in the use of force.

{¶ 40} Welsh reviewed the video and concluded that Orick had the right to arrest Martin, that Martin clearly understood that being arrested and going to jail was the likely outcome of his refusal to leave, and that the Taser was an appropriate and reasonable method of overcoming Martin's resistance. Further, Welsh stated that Martin resisted verbal commands and was actively hostile. November 18, 2008 DCSB Hearing Transcript, p. 168. Welsh additionally testified that based on the verbal commands made to Martin, and based on Martin's verbal and nonverbal responses, that it was reasonable to believe that Martin knew he was going to jail. According to Welsh, when people believe they are going to jail, they will either flee, posture, resist, or submit, Martin was posturing by saying "[d]o what you got to do, dog." Welsh, therefore, concluded that Martin knew he was going to be arrested.

{¶ 41} Officers Lowe and Orick both testified that, as the officers on the scene, they felt that use of the Taser was appropriate because of Martin's size and the fact that Orick thought they might have to fight Martin. Officer Fuller, who instructs in defensive training tactics at the police academy, testified that, in his opinion, Martin was actively hostile and

noncompliant before the Taser was used. Fuller stated that it was reasonable for Orick to anticipate the possibility of officer injury, because Martin was a pretty large individual. According to Fuller, Martin's defensive posture before being Tased was a clear warning sign to the officers.

{¶ 42} Fuller did indicate that he had first seen the video a month or two before the hearing. The video had been reviewed in SWAT training, and some instruction was done as the result of the video having been watched. Sergeant Gainy, who was another instructor, and was one of the persons doing a talk on the video, disagreed with Orick's actions. Other officers at the SWAT meeting thought Orick had done nothing wrong.

{¶ 43} Finally, Orick testified that Martin had complied with his command to leave to a degree, but that at a certain point, Martin stopped even minimal compliance and then things changed. In this regard, Orick testified as follows:

{¶ 44} "Q. And was he complying with your verbal commands?

{¶ 45} "A. To a certain degree. He was posturing; however, he was not, by my definition of leaving the area, leaving the area. So to a certain degree he was moving away, but at his own pace. And again, that was fine, up into a certain point where he came back on me, then things changed. But up into a certain point, to a certain degree, he was complying, complaining about it, but he was doing it.

{¶ 46} "A. At what point did he stop doing it?

{¶ 47} "Q. At which point the last time when I pulled the Taser out and notified that he was going to be Tased, even in the tape you can see his feet, he starts walking away. He literally takes one to two steps to walk away, at which point he turns around and closes the

distance back on me.

{¶ 48} "Q.  So he comes back?

{¶ 49} "A.  He comes back to me.  So from going from as far as the bumper back to me toward the tire of the car, which would be an additional two to three feet, would be my estimation, that's when it changed, and that's when my thought process changed about what was occurring.

{¶ 50} " * * * *

{¶ 51} "A. * * * Again, when the final order, while he was walking away, he was submitting.  He was still doing what I was saying; he was posturing away from me.  The moment that he turned around and faced me and came back and crossed arms, that's when the four things changed.  He is not fleeing, there is no flight.  As far as posturing going, that's done.  Now there could be an argument made that he was submitting, and I will argue with anybody all day that someone 290 pounds with their hands crossed above their shoulder, starting with breathing or heavy breathing, looking at me and saying do what you got to do, dog, is out of submission.  Putting their hands out and stretched to be handcuffed in front or in back, that's a submission.  Hands crossed defiantly across and pumping their chest out saying do what you got to do, dog, is not a submission.

{¶ 52} "In that case, the only one, the only things we are dealing, as in my thought process with PEDA, is we are going to fight.  At that point, for my safety, because I thought we was going to fight, for Officer Lowe's safety, we thought there was going to be a fight, the best way to encompass that with that man, that size, was to Tase him, drop him, control him, handcuff him, and search and transport.

**{¶ 53}** "Q.  Is it necessary to tell somebody they are under arrest before they are under arrest?"

**{¶ 54}** "A.  No."  Id. at pp. 252-55.

**{¶ 55}** After hearing the evidence, the DCSB hearing officer, Owens, recommended that Orick's discipline be disaffirmed.  Owens's decision credits the testimony of Orick and Orick's witnesses.  Owens concluded that Orick was justified in arresting Martin and in using the Taser to effectuate arrest.  In addition, Owens concluded that Orick was the best informed person in the situation.  Owens further concluded that Section I(B)(3)(a)(1), (2), and (3) applied to this case, as follows:

**{¶ 56}** "In (1), it may be argued that the suspect was passively hostile and not actively hostile.  However, in either instance, the 'verbal commands' are not required by the rules to have been words indicating arrest.  In (2), 'physical resistance' is not defined and it could be argued that 'active' resistance is contemplated, rather than refusing to complete a command (passive resistance).  However, in (3), it is clear that even 'anticipated' or 'possible' officer injury justifies the use of the Taser.  The word 'imminent' is not used.  Furthermore, it is not specified that the possible or anticipated injury must occur before, after or during the use of any words of arrest or custodial commands.  In section (e), the Taser is appropriate (only to the extent needed) to bring an individual under control/arrest.  'Control/arrest' is defined as 'control *or* arrest."  (Emphasis added.)

**{¶ 57}** "If the City wishes to further restrict the use of the Taser, it can tighten the rules governing the use of the Taser and it can recertify the police officers on a yearly basis.  However, based upon all of the circumstances of the case and the rules as they now exist, it

cannot be said the Appellant violated any Sections of Rule 13, Civil Service Rules and Regulations." Findings of Fact[,] Conclusions of Law and Recommendation of Action to be Taken, p. 5.

**{¶ 58}** Subsequently, the DCSB considered the matter and modified the 24-hour suspension to an eight-hour suspension. The DCSB noted that the parties had agreed that only Section I(B)(3)(a)(1) and (3) applied to the situation. The DCSB concluded that:

**{¶ 59}** " * * * On reviewing the incident, the Appellant's supervisors concluded that the passenger was not actively hostile (T 33). The supervisors also concluded that the passenger should have been informed that he was under arrest and given a chance to comply with the arrest order prior to any force being used against him. Furthermore, based on the individual's stance at the time of the Taser deployment – standing with his arms crossed over his chest – there is no suggestion of intent to injure the officer.

**{¶ 60}** "Police Officers are increasingly experiencing circumstances where citizens are noncompliant (T137). However a Taser can be used when an individual is noncompliant to an arrest, not when noncompliant to walking down the sidewalk, or threatening to deploy the Taser again if the individual does not roll over while on the ground (T 101; 268).

**{¶ 61}** "Officers are allowed to use discretion on the scene and make judgments based on the circumstances (T88). Nonetheless, there was an error in judgment about the appropriateness of the use of force at that particular time (T125). Accordingly, some level of discipline is appropriate in this case." Order on Appeal, p. 4.

**{¶ 62}** Because the City had not retrained officers yearly in compliance with its policy, the DCSB held that there were mitigating circumstances justifying modification of the

discipline. Accordingly, the DCSB concluded that Orick had violated Rule 13, Section 2(I), but had not violated Rule 13, Section 2(B) and (D). The DCSB thus modified the 24-hour suspension to an eight-hour suspension.

{¶ 63} Orick and the City both appealed to the common pleas court, which considered the matter on the transcript of the record that was filed, and the briefs of the parties. The trial court credited the hearing officer's findings, because he was the individual who heard the witnesses. The trial court concluded that the greater weight of evidence did not support the DCSB's conclusion that Martin was not actively hostile. The trial court also rejected the DCSB's conclusion that a warning of arrest was required prior to the Tasing, and that Martin exhibited no intent to injure Orick. The court held these conclusions were unsupported by the preponderance of substantial, reliable evidence. Finally, the trial court made no finding regarding the City's failure to annually recertifiy officers on the use of the Taser. The trial court concluded that Orick had not violated any rules, and remanded the matter to the DCSB.

{¶ 64} The City appeals from the judgment of the trial court.

II

{¶ 65} The City's sole assignment of error is as follows:

{¶ 66} "THE COURT OF COMMON PLEAS ERRED AS A MATTER OF LAW WHEN IT FOUND THAT THE DECISION OF THE DAYTON CIVIL SERVICE BOARD WAS NOT SUPPORTED BY A PREPONDERANCE OF SUBSTANTIAL, RELIABLE AND PROBATIVE EVIDENCE."

{¶ 67} Under this assignment of error, the City contends that the DCSB's decision to suspend Orick is supported by a preponderance of reliable, substantial, and probative

evidence, and that the trial court erred in disaffirming the decision. The City argues that the trial court improperly substituted its judgment for that of the DCSB by crediting the testimony of Orick's witnesses over those presented by the City.

{¶ 68} Police officers may appeal suspension decisions of a municipal civil service commission under either R.C. 124.34(C), which provides for review on questions of law and fact, or R.C. Chapter 2506, which requires courts to give " 'due deference to the administrative resolution of evidentiary conflicts.' " *Royse v. Dayton*, Montgomery App. No. 24172, 2011-Ohio-3509, ¶ 9 (citations omitted).

{¶ 69} Both Orick and the City indicated in the trial court that their appeals were being brought pursuant to R.C. Chapter 2506. Accordingly, we will apply the standards outlined in R.C. Chapter 2506.

{¶ 70} The scope of review of administrative orders is provided for in R.C. 2506.04, as follows:

{¶ 71} " * * * [T]he court may find that the order, adjudication, or decision is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record. Consistent with its findings, the court may affirm, reverse, vacate, or modify the order, adjudication, or decision, or remand the cause to the officer or body appealed from with instructions to enter an order, adjudication, or decision consistent with the findings or opinion of the court. The judgment of the court may be appealed by any party on questions of law as provided by the Rules of Appellate Procedure and, to the extent not in conflict with those rules, Chapter 2505 of the Revised Code."

{¶ 72} In appeals brought under R.C. Chapter 2506, the common pleas court "must weigh the evidence in the record and may consider new or additional evidence." *Smith v. Granville Twp. Board of Trustees,* 81 Ohio St.3d 608, 612,1998-Ohio-340, citing *Dudukovich v. Lorain Metro. Hous. Auth.* (1979), 58 Ohio St.2d 202, 206-07. However, review of the trial court's decision by a court of appeals is " '*more limited* in scope.' " *Henley v. Youngstown Bd. of Zoning Appeals,* 90 Ohio St.3d 142, 147, 2000-Ohio-493 (citation omitted, italics in original). Common pleas court judgments may be reviewed " ' only on "questions of law," which does not include the same extensive power to weigh "the preponderance of substantial, reliable and probative evidence," as is granted to the common pleas court.' * * * 'Appellate courts must not substitute their judgment for those of an administrative agency or a trial court absent the approved criteria for doing so.' " Id. (citations omitted). "Within the ambit of 'questions of law' for appellate court review would be abuse of discretion by the common pleas court." *Kisil v. City of Sandusky* (1984), 12 Ohio St.3d 30, 34, n. 4. Accord, *Henley,* 90 Ohio St.3d at 148. An abuse of discretion occurs when the trial court acts unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219 (citation omitted).

{¶ 73} After reviewing the record, we cannot say that the common pleas court abused its discretion, nor can we conclude that the court improperly credited one set of witnesses as opposed to another. The record contains competent evidence on both sides of the issue, and the trial court did not act unreasonably in relying on the testimony weighed most heavily by the hearing officer, who actually saw and heard the witnesses. "An administrative agency should accord due deference to the findings and recommendation of its referee, especially

where there exists evidentiary conflicts, because it is the referee who is best able to observe the demeanor of the witnesses and weigh their credibility." *Brown v. Ohio Bur. of Emp. Serv*. (1994), 70 Ohio St.3d 1, 2, citing *Jones v. Franklin Cty. Sheriff* (1990), 52 Ohio St.3d 40, 43. Even if we might have reached a different conclusion of fact on the evidence in this record, we cannot substitute our judgment for that of the trial court.

{¶ **74**} Accordingly, the City's sole assignment of Error is overruled.

III

{¶ **75**} The City's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

GRADY, P.J., and HALL, J., concur.

Copies mailed to:

Robert L. Caspar, Jr.
John J. Danish
Norma M. Dickens
Hon. Gregory F. Singer