[Cite as *Nuwin Realty, L.L.C. v. Englewood*, 2017-Ohio-480.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| NUWIN REALTY, LLC | : | |
| | : | |
| *Plaintiff-Appellant* | : | Appellate Case No. 27275 |
| | : | |
| v. | : | Trial Court Case No. 2016-CV-00377 |
| | : | |
| CITY OF ENGLEWOOD, OHIO, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| *Defendants-Appellees* | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 10th day of February, 2017.

. . . . . . . . . .

MATTHEW C. SORG, Atty. Reg. No. 0062971, 40 North Main Street, Suite 2700, Dayton, Ohio 45423
     Attorney for Plaintiff-Appellant

MICHAEL P. MCNAMEE, Atty. Reg. No. 0043861, CYNTHIA P. MCNAMEE, Atty. Reg. No 0056217, GREGORY B. O'CONNOR, Atty. Reg. No. 0077901, 2625 Commons Boulevard, Beavercreek, Ohio 45431
     Attorneys for Defendants-Appellees

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, Appellant, Nuwin Realty ("Nuwin") appeals from a judgment denying its administrative appeal of a demolition order issued by Appellees, City of Englewood and the Englewood Property Maintenance Board (collectively, "Englewood"). Nuwin contends that the trial court erred in rejecting its appeal because its structure was not a nuisance subject to demolition under Section 1454.05 of the Englewood Property Maintenance Code ("Code"). In addition, Nuwin contends that Englewood failed to communicate with Nuwin in preparing a schedule to mitigate or abate any alleged violation.

{¶ 2} We conclude that the trial court did not commit any error. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 3} Since early 2011, Nuwin has owned the Englewood Inn ("Inn"), which is located at 1212 South Main Street in Englewood, Ohio. The Inn was built in 1985 and consists of four separate buildings with a total of 106 units. When Nuwin purchased the property, there were existing property maintenance violations, including issues with the downspouts, support posts, soffits, brush, parking lot, and paint. As a result, Nuwin entered into a transfer of responsibility agreement, agreeing to assume responsibility for bringing the premises into compliance with minimum standards in the Code.

{¶ 4} Although the initial issues were apparently addressed, additional violations continued to occur. In December 2014, Englewood filed a criminal complaint against Nuwin, alleging that Nuwin had knowingly maintained the property in violation of Section

1454.04(h) of the Code, by failing to paint the building and by failing to remove dead trees, brush, overgrown vegetation, junk, and debris. The case concluded in early February 2015, with Nuwin pleading guilty to the violation. According to the testimony of William Singer, Englewood's Director of Community and Economic Development, the property owners addressed a minimal amount of items, but after the case concluded, the state of the property again deteriorated.

{¶ 5} On July 22, 2015, Englewood issued a notice of violation to Nuwin regarding dead and dying trees on the property. No response was received from Nuwin. Subsequently, on October 27, 2015, Englewood sent Nuwin a "Final Notice Property Maintenance Code Violation," advising that Nuwin was in violation of Sections 1454.04 and 1454.05 of the Code. The notice listed various conditions found on the property, including: "Rotting and deteriorating wood/material on buildings, trash and debris on property, missing and damaged shingles, sagging soffits, peeling/missing paint, dead/dying trees, unsecure doors to rooms, damaged vents, damaged porch support, impaired fascia board, and damaged downspouts." Transcript of Proceedings, Ex. D, p. 26.

{¶ 6} This notice listed actions that needed to be taken to abate the nuisance, and gave Nuwin five days to take one of the following actions: "fully and completely abate the nuisance as described above; work out a schedule satisfactory to the City, for the nuisance abatement, with sufficient surety acceptable to the City to guarantee completion on schedule; or appeal this determination to the City's Property Maintenance Board * * *." *Id.* at pp. 26-27. The notice was sent by William Singer, and his contact information was provided. Nuwin did not respond to this notice and did not appeal to the Property

Maintenance Board.

{¶ 7} On November 12, 2015, Englewood issued a notice of demolition to Nuwin. The notice was delivered to Nuwin by certified mail and ordinary mail to its address in Kendall Park, New Jersey. Personal service was also made on the Inn at its Englewood address by the Englewood Police Department. According to the notice, the property constituted an unabated public nuisance due to the following conditions: "Vacant and unoccupied buildings located on the Property; Rotting and deteriorating exterior wood; Damaged porch supports; Damaged roof, covered with a tarp; Unpainted exterior surfaces; Unsecure doors; Junk and debris stored on the Property; Overgrown trees and vegetation; Dead/dying trees on the Property; Damaged parking lot." *Id.* at p. 4.

{¶ 8} The notice stated that Nuwin had 30 days to do one of two things: (1) "fully and completely abate the above describe nuisance conditions via demolition"; or (2) "apply for a permit to repair the nuisance conditions in accordance with a construction schedule and plans to be submitted by the owner and approved in writing by the City, each with sufficient surety acceptable to the City to guarantee timely completion of the abatement according to an agreed upon schedule." Transcript of Proceedings, Ex. D, p. 4. In addition, the notice provided for an adjudicatory hearing on December 17, 2015. Singer again signed the notice and provided his contact information.

{¶ 9} After receiving the demolition notice, Nuwin did not apply for a permit to repair the nuisance conditions, nor did it submit a plan to Englewood, obtain Englewood's approval for a plan, or offer any surety to ensure that repairs would be made.

{¶ 10} An adjudicatory hearing was held as scheduled on December 17, 2015. Singer testified at the hearing, discussed the current condition of the property, and

identified recent photographs showing the property's condition. Singer stated that the buildings were in such a state of disrepair that other properties in the area would diminish in value. He also said the buildings were a blighting influence and had a negative effect on the city. As a result, Singer recommended that the demolition order be affirmed.

{¶ 11} The Englewood Fire Chief, Elmer Bergman, also testified at the hearing. He first identified a letter that he had sent to Singer on November 9, 2015, expressing his concern over the Inn's current status. Bergman was concerned about building four, which was unoccupied, was of wood frame construction, and could burn before anyone would notice, due to the lack of automated fire alarms in the building. Two fires had occurred at the Inn within the past month, with the most recent occurring the weekend before the hearing. The earlier fire that month had occurred below a water heater in an occupied building (building three), in a crawl space. Due to the rotting nature of the structure and the peril in which his firefighters were placed, Bergman had to remove them from the crawl space.

{¶ 12} Bergman testified that the fact that the facility was built on a crawl space was not the problem; the issue was that it had not been maintained over the years, and there were weaknesses in the structure from moisture under the crawl space. He also indicated that there were issues with lack of maintenance in connection with the fires. The water heater that malfunctioned was old and had not been maintained. In addition, the more recent fire was due to buildup of lint that would have been prevented by clearing lint from a dryer area, the ductwork, and the flue.

{¶ 13} Englewood also presented testimony from Englewood Police Chief, Mark Brownfield, who had compiled a report concerning the number of calls for service

generated by the various hotels in Englewood. Between January 1, 2015, and December 10, 2015, the Inn had the highest number of calls for police service (180) of any hotel. This number accounted for one-third of all the City's calls to the seven hotels. Brownfield indicated that a number of calls were very serious calls, like crimes in progress. In fact, while Brownfield was waiting to testify at the hearing, his office had received a call for a peace officer, which required him to send two officers. He stated that he only had three to four officers on patrol, and that having to send two officers so frequently consumed an inordinate amount of city resources.

{¶ 14} As part of his testimony, Brownfield identified a list of calls made to the Inn during the time period he discussed. These calls included many altercations, assaults, disorderly conduct situations, domestic violence situations, vandalism, and thefts, as well as a sexual assault and a robbery at gun point.

{¶ 15} Nuwin presented one witness at the hearing. The general manager, Gina Cheema, identified some repairs that had been made. For example, Nuwin had paid $325 on December 11, 2015, for repair of a roof; $416 in December 2015 for repair of unsecured locks; $90 on December 2, 2015, for cleaning and reattachment of gutters, and caulking of certain gutters; and $1,000 at some unidentified date for removal of dead shrubs and trees and cleanup. Transcript of Proceedings, Ex. E, attachments G, I, J, and O. Cheema also indicated that Nuwin had ordered 20 HVAC units for the unoccupied building and they would be installed by March 16, 2016, weather permitting. In addition, Cheema presented estimates for work to be done on the property. These estimates were dated December 10 and 16, 2015, and totaled about $24,317. *Id.* at Ex. E, attachment C. Several estimates indicated they were rough estimates. In addition,

the estimates for two buildings stated that painting exterior estimates would be sent later. Cheema estimated that the repairs would be done by March 16, 2016, weather permitting.

{¶ 16} Cheema also testified that she had contacted David White ten to fifteen times. She did not document all the days she had left a message, and the only thing she could find in her notes was that she had contacted White in December 2014, after she went to court on the criminal violation. Although White was not the person listed on the current violations, she contacted him because his name was on a letter she had received at some point.

{¶ 17} David White then testified on rebuttal. White stated that all his voicemails had been kept on his Outlook system, and he had only one voice mail from Cheema. This occurred in January 2015, right after the criminal court proceeding was filed, and he did not return that call. White further stated that he did not have any voice mails from Cheema after that time, and that Cheema had never contacted him regarding the demolition.

{¶ 18} After hearing the testimony, Englewood issued a decision on January 5, 2016, finding, among other things, that the City had demonstrated the existence of numerous continuing violations of the Code, that the property presented a significant fire hazard, that the property consumed a disproportionate amount of police resources, that the property contained numerous structural, interior, exterior, and cosmetic deficiencies, and that the work performed on the property as testified to by Cheema was largely cosmetic or superficial and did not address the major structural and fire-hazard conditions presented at the hearing. Englewood further concluded that the violations of Sections 1454.04 and 1454.05 had not been abated, and that Nuwin had not complied with

permissible alternate courses of action set forth in the Code. Accordingly, Englewood affirmed the decision to demolish the property, and authorized the City Manager or his designee to abate the nuisance on the property by demolition.

**{¶ 19}** Nuwin filed a notice of administrative appeal with the trial court, and the transcript of proceedings was submitted to the trial court on February 23, 2016, as a "no public access pleading."[1] After the parties filed briefs, the trial court issued a decision on September 1, 2016, affirming Englewood's decision to allow demolition of the property. Nuwin now appeals from the trial court's decision.

## II. Whether Appellant's Property is Subject to Demolition

**{¶ 20}** Nuwin's First Assignment of Error states as follows:

Appellant's Structure Is Not a Nuisance Subject to Demolition under Section 1454.05 of the Englewood Property Maintenance Code.

**{¶ 21}** Under this assignment of error, Nuwin contends that the trial court erred in affirming Englewood's decision because the administrative decision was arbitrary and capricious, and was unsupported by a preponderance of the evidence. In discussing this issue, Nuwin specifically addresses the provisions in the Code (Section 1454.05(a)(6)-(13)) that Englewood relied on in making its decision.

**{¶ 22}** Nuwin's appeal was brought pursuant to R.C. 2506.01, "which permits parties to appeal the final decisions of political subdivisions that result from a quasi-judicial proceeding in which notice, a hearing, and the opportunity for the introduction of

---

[1] We obtained the transcript and have reviewed it as part of our consideration of Nuwin's appeal.

evidence have been given." (Citation omitted.) *AT&T Communications of Ohio, Inc. v. Lynch*, 132 Ohio St.3d 92, 2012-Ohio-1975, 969 N.E.2d 1166, ¶ 8. R.C. 2506.03 allows common pleas courts to "admit and consider new evidence" (which was not requested here), and to "weigh evidence on the whole record." (Citation omitted.) *Id.* at ¶ 12. Nonetheless, "while an appeal under R.C. 2506.01 resembles a *de novo* proceeding, it is not *de novo*." *Id.* at ¶ 13, citing *Dudukovich v. Lorain Metro. Hous. Auth.*, 58 Ohio St.2d 202, 206-207, 389 N.E.2d 1113 (1979).

{¶ 23} In *Lynch*, the court stressed that "[t]here are limits to a court of common pleas review of the administrative body's decision. For example, in weighing evidence, the court may not 'blatantly substitute its judgment for that of the agency, especially in areas of administrative expertise.' " *Id.*, quoting *Dudukovich* at 207. Furthermore, " '[i]n reviewing the administrative body's decision, a court of common pleas is authorized to determine whether the agency's decision is 'unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence.' " *Id.* at ¶ 14, quoting R.C. 2506.04. "The court will then 'affirm, reverse, vacate, or modify the order * * *, or remand' the underlying administrative decision under that standard of review specified in the statute. R.C. 2506.04. These standards that a court of common pleas must employ and the dispositions that it must reach are more limited than relief that could be awarded pursuant to a trial, and therefore, the administrative appeal is more akin to an appeal than a trial." *Id.*

{¶ 24} Our review is more limited than that of the common pleas court. (Citations omitted.) *Indep. v. Office of the Cuyahoga Cty. Executive*, 142 Ohio St.3d 125, 2014-Ohio-4650, 28 N.E.3d 1182, ¶ 14. An appellate court reviews a "common pleas court's

judgment only on questions of law and does not have the same extensive authority to weigh the evidence." (Citations omitted.) *Id.* "Within the ambit of questions of law for appellate-court review is whether the common pleas court abused its discretion. * * * The court of appeals must affirm unless it finds, as a matter of law, that the trial court's decision is not supported by a preponderance of reliable, probative, and substantial evidence." *Id.*, citing *Kisil v. Sandusky*, 12 Ohio St.3d 30, 34, 465 N.E.2d 848 (1984).

{¶ 25} Section 1454.04 of the Code lists various conditions and acts that are public nuisances. One such condition is inadequate property maintenance, which Section 1454.04(h) defines as follows:

For any person owning, leasing, occupying or having charge or possession of any premises in the City to maintain such premises in such a manner that any of the following conditions exist thereon:

(1) Buildings which are abandoned, dilapidated, improperly secured, partially destroyed, functionally obsolete, or left in a state of partial construction;

(2) Unpainted buildings resulting in dry rot, warping, and termite infestation;

(3) Broken windows constituting hazardous conditions and inviting trespassers and malicious mischief;

(4) Overgrown vegetation, which exceeds eight inches in height, causing detriment to neighboring properties or a hazardous condition to pedestrian or vehicular traffic, or likely to harbor rats, vermin, and other nuisances * * *.

{¶ 26} Section 1454.05(a) of the Code further provides that "[a]ny building, structure or paved area exhibiting any of the following conditions or defects to a significant degree shall be deemed a nuisance and shall be altered or repaired so as to abate the nuisance forthwith * * *."  This section then lists thirteen specific conditions.

{¶ 27} Consistent with Section 1454.05(a), the demolition order that Englewood issued on January 5, 2016, cited violations of 1454.05(a)(6)-(13).  We will consider Nuwin's arguments about each alleged violation, bearing in mind that we must affirm, unless we find, "as a matter of law, that the trial court's decision is not supported by a preponderance of reliable, probative, and substantial evidence."  *Indep.*, 142 Ohio St.3d 125, 2014-Ohio-4650, 28 N.E.3d 1182, at ¶ 14.

### A.   Section 1454.05(a)(6)

{¶ 28} Section 1454.05(a)(6) provides that a nuisance is deemed to exist:

Whenever the building or structure, or any portion thereof, because of dilapidation, deterioration, decay, faulty construction, removal or movement of some portion of the ground necessary for the purpose of supporting such building or portion thereof, or other cause, is likely to partially or completely collapse, or some portion of the foundation or underpinning is likely to fail or give way * * *.

{¶ 29} Nuwin argues that this condition did not exist, because there was no evidence that anything was wrong with the foundation.  In particular, Nuwin points out that no structural engineer examined the Inn, and that the only testimony was from Fire Chief Bergman, who "speculated" about a lot of weakened floors, but said that was not

his "bailiwick."

{¶ 30} We disagree with this characterization of the testimony. Bergman testified that when firefighters were in the crawl space under building three, they had to be pulled out because the structure was rotting and could have collapsed on them. He further stated that he had observed a lot of weakened floors and that the problem with the facility was that it had not been maintained, and moisture over the years had caused the structure of the building to be rotted. This fits precisely within the requirements of Section 1454.05(a)(6), and we cannot find that the trial court's decision on this ground was unsupported by the appropriate degree of evidence.

B. Section 1454.05(a)(7)

{¶ 31} Section 1454.05(a)(7) provides that a nuisance is deemed to exist "[w]henever, for any reason, a building or structure, or any portion thereof, is manifestly unsafe for the purpose for which it is used * * *." Regarding this finding, Nuwin separately discusses five conditions, and argues that they were remedied or in the process of being remedied at the time of the hearing.

1. Vacant and Unoccupied Buildings

{¶ 32} According to the evidence, building four was unoccupied. Nuwin notes testimony from Cheema that this building was closed during the winter due to lack of occupancy and was winterized. Nuwin argues that this evidence indicates that Nuwin was concerned about safety.

{¶ 33} Contrary to this assertion, Chief Bergman testified that the building

contained no automated fire alarms, and being unoccupied, could burn for quite a while before being noticed. As a result, fire could jump to other buildings. Furthermore, two fires had occurred in the past month, although they were in other buildings. Bergman also indicated that because of the crawl spaces under the buildings, fire could spread throughout a building without alarms going off, because there were no automatic detection devices.

{¶ 34} However, fire was not the only issue. This section refers to "any reason" making a structure manifestly unsafe. In this regard, Police Chief Brownfield testified in detail about the many service calls the police made for serious offenses. The amount of crime also posed a danger. Accordingly, we cannot find that the trial court's decision was unsupported by the appropriate level of evidence in this regard.

## 2. Exterior Wood

{¶ 35} Under this discussion, Nuwin argues that by the time of the hearing, it had already made a number of repairs like replacing rotted landscape timbers and some support beams, and was providing estimates for other repairs. After the hearing, Englewood concluded that any repairs were cosmetic. The trial court was also unpersuaded by these arguments, noting that the history of the case indicated that the Inn was a subject of concern before Nuwin acquired it in 2011, and that conditions had not changed. We agree with this assessment. The poor condition of the property was consistent over a long period of time, and a minimal amount of cosmetic work was done in the few days leading up to the demolition hearing.

{¶ 36} Furthermore, Section 1454.09(d) provides that "[a]n owner shall have five

calendar days from receipt of a standard notice of violation to take one of the following actions: fully and completely abate the nuisance; work out a schedule, satisfactory to the City, for the nuisance abatement, with sufficient surety acceptable to the City to guarantee completion on schedule; or appeal the determination of the Housing Officer of the existence of a nuisance and/or the remedy required to the Board." After Nuwin received the October 27, 2015 final notice of violation, it took none of these actions.

{¶ 37} Section 1454.09(b) also contains requirements pertaining to demolition notices, which "specify that an owner has thirty calendar days within which to either fully and completely abate the nuisance via demolition or work out a schedule, satisfactory to the City, for the demolition, with sufficient surety acceptable to the City to guarantee timely completion of the abatement according to schedule * * *." Englewood's demolition notice also gave Nuwin the option to "apply for a permit to repair the nuisance conditions in accordance with a construction schedule and plan to be submitted by the owner and approved in writing by the City, * * * with sufficient surety acceptable to the City to guarantee timely completion of the abatement according to an agreed upon schedule." Transcript of Proceedings, Ex. D, p.4.

{¶ 38} After Nuwin was sent the November 12, 2015 demolition notice, Nuwin failed to take any of the steps outlined in the demolition notice. Showing up at the hearing, with a few minor repairs having been completed and some estimates, did not comply with the actions the Code and demolition notice required.

### 3. Roof, Porch, and Soffits

{¶ 39} Again, regarding these items, Nuwin argues that some repairs were made

and others were to be scheduled. For the reasons just discussed, the trial court's decision is consistent with the level of evidence required for affirmance of the agency decision. In this regard, we note that the trial court discussed Cheema's testimony, in which she admitted that the final notice of violations was clear on what was wrong and what needed to be done. *Final and Appealable Decision and Entry Affirming the Decision of the City of Englewood Property Maintenance Hearing Board*, Doc. #18, p. 11, quoting *Transcript of Proceedings*, Ex. B (Hearing Transcript), p. 55. The court also noted the following exchange that occurred immediately after this admission:

Q. Didn't do any of the repairs to the building that was required?

A. Correct.

*Id.*

**{¶ 40}** Accordingly, we find no merit in Nuwin's argument.

### 4. Doors, Drainage System, and Paint

**{¶ 41}** Concerning these items, Nuwin once more makes the same argument – that some repairs were made and others would be made in the future. Again, based on the evidence presented at the hearing, these repairs were minor and cosmetic, and also did not comply with what the Code and demolition notice required.

### 5. Debris and Landscaping

**{¶ 42}** Nuwin's final argument in this context is that some work had been done. In response, Englewood points out that none of the work addressed core safety issues. Again, we agree.

### C. Section 1454.05(a)(8)

{¶ 43} Section 1454.05(a)(8) of the Code provides that a nuisance is deemed to exist:

> Whenever a building or structure has been so damaged by fire, wind, earthquake, flood or other cause, or has become so dilapidated or deteriorated as to become an attractive nuisance to children who might play therein to their danger, or as to afford a harbor for vagrants, criminals or immoral persons, or as to enable persons to resort thereto for the purpose of committing a nuisance or unlawful or immoral acts * * *.

{¶ 44} Nuwin's argument in connection with this section is that while 180 calls in less than a year may seem significant, the testimony of the police chief was that some calls possibly did not occur from acts occurring at the Inn. Nuwin also alleges that a significant number of calls were made for other reasons, including medical needs.

{¶ 45} We have reviewed the testimony and the call record. Chief Brownfield stated that, actually, more than 180 calls about the Inn had likely occurred, because the police received a lot of calls about issues at the Inn that had spilled over into the parking lot of the restaurant next door. As a result, these additional calls would not have shown up on the list of calls attributed to the Inn. Transcript of Proceedings, Ex. B, pp. 33-34. Brownfield also stated that "[y]ou might be able to pick out one or two in here [the call list] that might not be totally related to 1212, but it's not a location where we stop cars on a regular basis as routine traffic because it's too much of a traffic snarl there * * *." *Id.* at p. 34.

**{¶ 46}** Brownfield also testified that "[a] lot of the calls there are very serious calls, they're crimes in progress calls * * *. We get a lot of crimes in progress down there. And we've had some more of our serious calls down there at 1212, calls involving guns and things like that." *Id.* at 35-36. As was noted above, the call record supports these statements. Finally, Brownfield testified that the Inn consumed an inordinate amount of police resources. Nuwin offered nothing to dispute this testimony.

### D. Section 1454.05(a)(9)

**{¶ 47}** Section 1454.05(a)(9) states that a nuisance is deemed to exist with respect to:

> Any building or structure which has been constructed or which now exists or is maintained in violation of any specific requirement or prohibition of the building regulations of the City, or of any law or ordinance of the State, County or City relating to the condition, location or structure of buildings * * *.

**{¶ 48}** In connection with this alleged condition, Nuwin argues that there was no evidence indicating that it had violated any ordinances relating to the condition or structure of the buildings, and that any potential material violations had been fixed prior to the hearing or were scheduled to be fixed. For the reasons previously discussed, this argument is without merit. The repairs were not directed to material violations and did not correct significant safety issues.

### E. Section 1454.05(a)(10)

**{¶ 49}** Under Section 1454.05(a)(10), a nuisance is deemed to exist:

> Whenever a building or structure, used or intended to be used for dwelling purposes, because of dilapidation, decay, damage, faulty construction or arrangement or otherwise, is unsanitary, unfit for human habitation or in a condition that is likely to cause sickness or disease, when so determined by the Housing Officer, or is likely to cause injury to the health, safety or general welfare of persons living within or nearby * * *.

**{¶ 50}** In response to this provision, Nuwin argues that it does not apply because a hotel is not a "dwelling" as defined in Section 1270.01(21) of the Code. The section Nuwin refers to is contained in Part Twelve (Planning and Zoning), Title Six (Zoning Code), Chapter 1270 (Definitions). In contrast, the provisions pertaining to nuisances are contained in Part Fourteen (Building and Housing), Title Four (Miscellaneous Building Regulations), Chapter 1454 (Nuisances).

**{¶ 51}** Section 1454.01, which outlines the purpose of Chapter 1454, states that:

> The condition of all premises and the exterior of all buildings and structures thereon shall be maintained at a level in keeping with the standards of the City. The purpose of this chapter shall be the elimination and prevention of blighting effects and hazards to health, safety and welfare.

**{¶ 52}** Based on this provision, Chapter 1454 applies to *all* buildings and structures in Englewood, including commercial structures like the Inn. Section 1454.01, which is also contained in Chapter 1454, further provides that:

> Where terms are not defined in this chapter, they shall have ascribed

*to them the meanings set forth in the definitions contained in the Zoning Code. If such terms are not defined under the Zoning Code, they shall have ascribed to them their ordinarily accepted meanings or such meanings as the context may imply.*

(Emphasis added.)

{¶ 53} The definitions in Chapter 1454 are found in Section 1454.02, which does not define the term "dwelling purposes." Section 1270.01 contains the definitions in the Zoning Code. However, Section 1270.01 also does not define the term "dwelling purposes."

{¶ 54} Instead, Section 1270.01(21) only defines "dwelling," and states that "Dwelling" means a structure or building, or portion thereof, used exclusively for residential occupancy, including one-family and multifamily dwellings, but not including hotels, lodging or boarding houses or tourist homes." Parts A-F of this definition also describe various types of dwellings, including single-family dwellings, two-family dwellings, multi-family dwellings, and so forth.

{¶ 55} Because "dwelling purposes" is not a term defined in the definition portion of the Zoning Code, the fact that Section 1270.01(21) excludes hotels as a "dwelling" is irrelevant. As was noted, when terms are not defined in the Zoning Code, Section 1454.01 indicates that resort should be made to ordinary accepted meanings or the meaning that the context implies. Applying the meaning that the context implies, a reasonable interpretation of Section 1454.05(a)(10) is that hotels are subject to the provision. Specifically, hotels are used for dwelling purposes, since individuals choose to dwell there, even if only temporarily. This is consistent with the purpose of Chapter

1454, which applies to all buildings and structures in the city. It would be incongruous to exempt hotels from a provision like Section 1454.05(a)(10), which is intended to protect the public from health and safety hazards.

{¶ 56} For the reasons previously discussed, the trial court's decision regarding the fact that the Inn presented a nuisance is supported by the appropriate degree of evidence.

F. Section 1454.05(a)(11)

{¶ 57} Section 1454.05(a)(11) states that a nuisance is deemed to exist:

Whenever a building or structure, used or intended to be used for dwelling purposes, has light, air and sanitation facilities inadequate to protect the health, safety or general welfare of persons living within * * *.

{¶ 58} Nuwin challenges this finding based on the fact that the term "dwelling purposes" does not include hotels. We have already rejected that argument. Nuwin also contends that it was in the process of fixing the rooms that lacked air-conditioning and heat, because it had ordered 20 HVAC units shortly before the demolition hearing.

{¶ 59} As we previously noted, Nuwin failed to comply with the requirements imposed by Chapter 1454. When Nuwin received the October 27, 2015 notice of final violation, it could have followed the procedures set forth in Section 1454.09(d). Nuwin failed to do anything. More importantly, after the November 12, 2015 demolition notice was issued, Nuwin could have fully abated the nuisance by demolition or could have worked out a schedule for demolition, with sufficient surety, pursuant to Section 1454.09(b). Nuwin also could have applied for a permit to remedy the nuisance, in

compliance with the terms listed in the demolition notice. Appearing at the demolition hearing with a list of anticipated repairs was not an appropriate response.

### G. Section 1454.05(a)(12)

{¶ 60} According to Section 1454.05(a)(12), a nuisance is deemed to exist:

Whenever any building or structure, by reason of obsolescence, dilapidated condition, deterioration, damage, electrical wiring, gas connections, heating apparatus or other cause, is in such a condition as to be a fire hazard and is so situated as to endanger life or other buildings or property in the vicinity or to provide a ready fuel supply to augment the spread and intensity of fire arising from any cause * * *.

{¶ 61} Nuwin contends that the Inn did not fall within this section because only three fires occurred in ten years, and the two fires that happened within the month prior to the hearing were caused by mechanical issues. The relevance of how the fires occurred is unclear. Moreover, as was noted, there was significant testimony at the hearing about the risk of fire hazard, and Nuwin failed to counter this evidence. Not only did the vacant building pose a substantial risk of fire spreading without warning, the lack of automatic alarms and the difficulty in combating fire in the buildings due to rotting infrastructure were also situations that endangered life and other property.

### H. Section 1454.05(a)(13)

{¶ 62} The final section Nuwin addresses is Section 1454.05(a)(13), which states that a nuisance is deemed to exist:

Whenever any sidewalk or driveway is debilitated, broken, damaged or raised to such a degree as to be injurious to property or to persons using such driveway or sidewalk.

**{¶ 63}** Regarding this issue, Nuwin argues that no evidence was presented at the hearing to indicate that the parking lot was so bad that it was beyond repair. At the hearing, William Singer, who had been at the property recently and had taken pictures a few days before the hearing, stated that the parking lot contained "numerous cracks and alligatoring." Transcript of Proceedings, Ex. B, pp. 9 and 19. *See also* Transcript of Proceedings, Ex. D, p. 8 (photos showing damage to parking lot).

**{¶ 64}** Notably, the Code does not require that that a sidewalk or driveway be damaged "beyond repair." For a nuisance to exist, the paved area must contain defects to a significant degree that could result in injury to person or property who use the paved area. Nuwin failed to present any evidence at the hearing to dispute the condition of the parking lot. Nuwin's representative did identify estimates for fixing cracks in the walkways and replacing concrete, the extent of which indicates that the sidewalks were substantially damaged. *See* Transcript of Proceedings, Ex. E, attachment C (showing estimates for "patching concrete walk near office," patching concrete walkways in other areas, replacing sections of concrete, and sealing cracks in 237 feet of walkways.)

**{¶ 65}** Based on the preceding discussion, the trial court did not abuse its discretion in affirming Englewood's demolition order. In addition, we cannot find that the trial court's decision was unsupported by reliable, substantial, and probative evidence. Accordingly, the First Assignment of Error is overruled.

III.   Alleged Failure of Englewood to Communicate

**{¶ 66}** Nuwin's Second Assignment of Error states that:

Appellees Failed to Communicate with Appellant in Preparing a Schedule to Mitigate or Abate any Alleged Violation, as Instructed in the City's Notice to Appellant.

**{¶ 67}** Under this assignment of error, Nuwin contends that the trial court erred by overlooking the testimony of Gina Cheema, who testified that she had attempted to contact Englewood at least ten times and had received no response.   Nuwin further argues that it had fixed any alleged material violations prior to the hearing.   And, based on this latter assertion, Nuwin contends that Englewood acted inappropriately in attempting to demolish a compliant owner's property.

**{¶ 68}** "Generally, notice and an opportunity to be heard prior to the demolition of property by a municipality is required."   (Citations omitted.)   *Jackson v. Cleveland Dept. of Bldg. & Hous.*, 2012-Ohio-3688, 976 N.E.2d 254, ¶ 15 (8th Dist.).   There is no dispute in the case before us about the fact that Nuwin received notice and an opportunity to be heard in connection with the demolition.   The demolition notice, which Nuwin admittedly received, could not have been more clear about what needed to be done.   The demolition notice allowed Nuwin the option of applying "for a permit to repair the nuisance conditions in accordance with a construction schedule and plans to be submitted by the owner and approved in writing by the City, * * * with sufficient surety acceptable to the City to guarantee timely completion of the abatement according to an agreed upon schedule." Transcript of Proceedings, Ex. D, p. 4.

**{¶ 69}** Nuwin did not apply for a permit to repair the conditions, did not submit a

construction schedule and plans, did not get approval in writing from the City for the schedule and plans, and did not attempt to provide sufficient surety to the City. These failures are fatal to Nuwin's position.

**{¶ 70}** Furthermore, even if this were otherwise, Cheema's testimony about her efforts to contact Englewood is problematic for several reasons. First, despite the fact that William Singer's name and contact information were on the violation and demolition notices, Cheema never attempted to contact Singer. Instead, she only attempted to contact a different individual – David White. White had been involved in the criminal case against Nuwin, which ended months before the final violation notice and demolition notice were issued.

**{¶ 71}** In addition, although Cheema said that she made numerous attempts to contact White, she also said she did not document all the days that she attempted to contact him. Instead, she testified that she only began documenting after she went to court in December 2014 (implying that attempts to contact White occurred earlier and that she would have documented any later attempts). In this regard, Cheema stated that the only documentation she could find in her notes was that she had contacted White in December 2014, after she went to court on the criminal case on December 17, 2014. Again, this was months before the notices for the current violations were issued. Cheema did not testify to any specific dates of attempted contact after December 2014.

**{¶ 72}** Moreover, Englewood called White as a rebuttal witness. White testified that all his voice-mails were preserved and that he had only one voice-mail from Cheema, in January 2015. This was during the pendency of the criminal case, which ended in February 2015, and White did not return that particular call. As was noted, this was

months before the additional violations, and there is no indication that White had anything to do with further proceedings involving Nuwin and the Inn. We fail to see the relevance of White's failure to return a telephone call in January 2015.

**{¶ 73}** Notably, in administrative proceedings, the agency is the trier of fact, and decides issues of credibility. *See, e.g., Strongsville Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 77 Ohio St.3d 402, 406, 674 N.E.2d 696 (1997), and *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 111, 407 N.E.2d 1265 (1980). In *Conrad*, the court stressed that due to the nature of administrative review by common pleas courts, "the court should defer to the determination of the administrative body, which, as the factfinder, had the opportunity to observe the demeanor of the witnesses and weigh their credibility." *Id. Accord Orick v. Dayton*, 2d Dist. Montgomery No. 24259, 2011-Ohio-4193, ¶ 73.

**{¶ 74}** Thus, even if Cheema's attempts to contact White were somehow relevant, Englewood was entitled to choose which witness to believe, and the trial court did not err to the extent that it deferred to Englewood's resolution of evidentiary conflict.

**{¶ 75}** In light of the preceding discussion, the Second Assignment of Error is overruled.

## IV. Conclusion

**{¶ 76}** All of Nuwin's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.


Copies mailed to:

Matthew C. Sorg
Michael P. McNamee
Cynthia P. McNamee
Gregory B. O'Connor
Hon. Dennis J. Langer